# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 96-30671

---

JOHN L. DAVIS,

Plaintiff-Appellant,

FIDELITY & CASUALTY COMPANY OF NY,

Intervenor/Plaintiff-Appellant,

versus

DOW CHEMICAL, ET AL.,

Defendants,

J.E. MERIT, a Division of Jacobs Engineering
Group, Inc.,

Defendant-Appellee.

---

Appeals from the United States District Court
For the Middle District of Louisiana
(91-CV-859)

---

June 11, 1997

Before POLITZ, Chief Judge, KING, Circuit Judge, and FOLSOM,[*] District Judge.

POLITZ, Chief Judge:[**]

---

[*] District Judge of the Eastern District of Texas, sitting by designation.

[**] Pursuant to Local Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in Local Rule 47.5.4.

John Davis appeals an adverse judgment as a matter of law following a favorable jury verdict. Concluding that the district court erred in granting the judgment as a matter of law and in alternatively granting a motion for new trial, we reverse and render judgment on the jury verdict.

<u>Background</u>

Davis claims that he suffered injuries in September 1990 as a result of inhaling fumes from a chemical spill in the L.G.T.I. Unit at the Dow Chemical plant in Plaquemine, Louisiana. Dow had shut down the unit and hired several contract crews to perform repairs, cleaning, and routine maintenance.

The unit contained a cooling system for quench water, referred to as the Fin-Fan, located 30 feet above ground in one of two pipe racks separated by an alleyway for the movement of people and vehicles. Several days before the incident in question employees of Dowell-Schlumberger, a contract company, had cleaned the Fin-Fan by pumping 1500 gallons of a 20% hydrochloric acid solution through its pipes. "Blinds" were installed in pipes and valves for the purpose of cordoning off the equipment and pipes being cleaned. The Fin-Fan was then rinsed with water and a soda ash solution and drained.

Davis worked at the Dow plant as lead carpenter for a contract scaffolding crew. He was employed by Cherokee Construction Company. On September 15,

2

1990 at approximately 11:30 p.m. while he and his crew were putting up scaffolding in the LGTI Unit, Davis, who was in the scaffolding approximately 20 to 25 feet above the ground on the opposite side of the alleyway from the Fin-Fan, noticed a large, thick white cloud of vapors rising from the alleyway about five to ten feet from the Cherokee truck. He also saw a clear liquid pouring from the pipe rack across the alleyway, splattering through the scaffolding, and falling to the alleyway. The scaffolding crew smelled a strong odor and quickly evacuated the area. When Davis reached the end of the alleyway, about 45 seconds after first noticing the fumes, he looked up into the pipe rack and saw two men wearing blue hard-hats putting bolts into a pipe or valve located directly above the scaffolding through which the clear liquid was pouring. The men were removing a blind that had been installed before commencement of the acid wash.

About that time James White arrived. White worked for J.E. Merit, a contractor on site, but he was also the night shift coordinator and liaison between Dow and the several contract companies performing services as part of the maintenance work being done on the LGTI Unit. When White spotted the leak he yelled at the men wearing the blue hard-hats, instructing them to immediately put the bolts back in the valve.

3

White discussed the incident at the next safety meeting,[1] telling the contract workers to be careful about causing a spill and that they should take care to prevent any liquid from falling to the ground. White warned the workers that causing a leak could result in being fired. At the meeting, the two workers wearing the blue hard-hats Davis saw in the scaffolding sat at a table reserved for J.E. Merit employees, and White, a Merit supervisor, directed some of his comments to the two employees who wore the blue hard-hats. White obviously knew them, addressing one by a nickname.

After the spill, Davis and his men had a brief dinner and then returned to the site which Dow personnel had washed down. White directed that the Cherokee truck be moved from the alleyway. When Davis opened the driver side door he encountered fumes like those he had experienced during the spill. The fumes apparently had entered the truck through a broken passenger window. Davis was overcome by the fumes and momentarily lost his breath. After allowing time for the truck to air out, Davis removed it from the alleyway.

By the end of his shift Davis felt as if he was coming down with a bad cold. His condition worsened, and on September 19, 1990 he sought medical attention.

---

[1] Evidence varied on whether this meeting occurred immediately following the spill or the day after.

After he told the emergency room doctor about the September 15 incident, the doctor diagnosed tracheal bronchitis and prescribed various medicines. The company doctor also gave Davis medication to alleviate his cold and flu-like symptoms.

When his symptoms did not improve, Davis went to see Dr. Thomas Nuttli, a pulmonologist. After running several tests, Dr. Nuttli diagnosed Davis as having Reactive Airways Dysfunction Syndrome as a result of acid vapor inhalation.[2] Dr. Nuttli treated Davis for nearly two years; his replacement continued to treat Davis at the time of trial.

Davis sought damages for these injuries. His first jury trial occurred in January 1994. At the close of Davis's case-in-chief, the district court granted J.E. Merit's motion for judgment as a matter of law. Davis appealed, we reversed the judgment as a matter of law, vacated the district court's denial of Davis's motion for a new trial, and remanded the case for further proceedings.

---

[2] Dr. Dalton, an allergist who had performed tests on Davis, testified that Davis did not have any allergies that would cause the head, throat, and chest symptoms he continued to experience. Dr. Dalton testified that Davis was suffering from a reactive airways disorder contemporaneous with and causally related to his chemical exposure at Dow. Additionally, in May 1991 Davis's worker's compensation carrier, Fidelity & Casualty Company of New York, sent Davis to another pulmonary disease specialist who testified that he agreed with Dr. Nuttli's diagnosis and that Davis's condition was caused by exposure to chemical fumes on September 15.

The second jury trial was had in November 1995.  At the close of Davis's case-in-chief, J.E. Merit again moved for judgment as a matter of law.  The district court denied the motion and the case was submitted to the jury.  The jury answered four special interrogatories in the affirmative, finding that employees of J.E. Merit or a person acting under Merit's control removed a "blind" from a pipe at Dow's LGTI Unit, that the act was negligent or done in a negligent manner, that the act caused the leakage of a harmful substance, and that the harmful substance injured the plaintiff.  The jury returned a verdict for Davis -- $9,000 for past medical expenses, $50,000 for future medical expenses, $68,000 for past lost wages, $200,000 for loss of future earning capacity, and $125,000 in general damages.

Merit renewed its motion for judgment as a matter of law and, in the alternative, a motion for new trial.  The district court granted both of Merit's motions and entered judgment in accordance with those rulings.[3]  Davis timely appealed.

Analysis

A.    Judgment as a Matter of Law

We review a judgment as a matter of law *de novo*, applying the same

---

[3] The court conditionally granted a new trial depending on whether we reversed the judgment as a matter of law.

standard used by the district court.[4]  The evidence, along with all reasonable inferences which can be drawn therefrom, is considered in the light most favorable to the jury verdict.[5]  A judgment as a matter of law should not be granted unless the facts and inferences point so strongly and overwhelmingly against the verdict that reasonable persons could not disagree.[6]

Our task is to determine whether there was evidence before the jury supportive of each element of Davis's claim.  This is a simple negligence case. Substantial evidence supports the finding that Davis was injured by fumes he inhaled on the evening in question while working at the Dow facility. Eyewitnesses testified that a cloud of noxious vapors arose from the area of the chemical spill.  Davis's testimony and that of several doctors adequately substantiated his claim that his subsequent physical difficulties resulted from the inhalation of noxious fumes from that spill.  The jury permissibly could have inferred negligence.  White testified that on previous occasions chemicals had leaked behind the blinds.  It was therefore foreseeable that this scenario might occur and the jury was free to conclude, as it obviously did, that the failure to

---

[4] **Ikerd v. Blair**, 101 F.3d 430 (5th Cir. 1996).

[5] **Crosthwait Equip. Co. v. John Deere Co.**, 992 F.2d 525 (5th Cir. 1993).

[6] **Omnitech Int'l, Inc. v. Clorox Co.**, 11 F.3d 1316 (5th Cir. 1994).

anticipate and prevent a spill of this nature was, under all relevant circumstances, unreasonable and therefore negligent.

The only arguable basis for upholding the judgment as a matter of law is that the identity of the employees responsible for the spill was not proven adequately. The district court rested its judgment on this point. Our review of the record persuades that sufficient evidence supported the jury's determination that the responsible workers were employees of J.E. Merit, or persons for whom J.E. Merit was legally responsible.

Davis testified that only J.E. Merit employees wore blue hard-hats. White arrived on the scene and ordered the two men in the pipe rack to stop the leak. During the safety meeting the employees in question sat at a table reserved for J.E. Merit employees and White addressed admonitions to them personally, calling one of them by a nickname. It cannot be gainsaid that reasonable minds could differ as to the identity of the critical employees. The judgment as a matter of law was granted in error and must be reversed.

B.    Motion for New Trial

The trial court may set aside a jury verdict which is against the great weight and preponderance of the evidence.[7]

---

[7] **Williams v. Chevron U.S.A., Inc.**, 875 F.2d 501 (5th Cir. 1989).

When the trial judge sets aside a jury verdict and orders a new trial, however, our deference to him is in opposition to the deference due the jury. Consequently, in this circuit as in several others, we apply a broader review to orders granting new trials than to orders denying them. And where a new trial is granted on the ground that the verdict is against the weight of the evidence, we exercise particularly close scrutiny, to protect the litigants' right to a jury trial.[8]

To prevent an inappropriate substitution of the trial court's judgment for that of the jury, new trials granted on evidentiary grounds will not be upheld "unless, at a minimum, the verdict is against the great-not merely the greater-weight of the evidence."[9]

In prior cases, we have noted three factors that militate against new trials and require a particularly searching review of the evidence: (1) simplicity of the issues, (2) the extent to which the evidence is in dispute, and (3) the absence of any pernicious or undesirable occurrence at trial.[10] If these factors are present,

our deference to the jury is reinforced by our confidence in its ability to understand the issues, to evaluate credibility and sort through conflicting testimony, and to act reasonably and fairly in the absence of prejudicial influences. In this situation there is little, if any, need to defer to the judge as against the jury, and we will not affirm an order granting a new trial unless on review we are satisfied, independently, that the jury verdict was against the great weight of the

---

[8] **Shows v. Jamison Bedding, Inc.**, 671 F.2d 927, 930 (5th Cir. 1982) (citations omitted).

[9] **Conway v. Chemical Leaman Tank Lines, Inc.**, 610 F.2d 360, 363 (5th Cir. 1980).

[10] See, e.g., **Shows**; **Conway**.

evidence.[11]

All of the foregoing principles apply to this case; we cannot agree that the verdict was against the great weight of the evidence.

The evidence varied about whose employees were in the pipe rack. The plaintiff asserted that they were J.E. Merit employees primarily because (1) they wore blue hats, which he understood were unique to J.E. Merit employees; (2) they were seated at a table reserved for J.E. Merit employees during the safety meeting; (3) White, the J.E. Merit supervisor, admonished the workmen and called one of them by a nickname during that meeting; and (4) the removal of blinds was a task that J.E. Merit employees would likely perform. Evidence supports all of these assertions.

There was controverting evidence. Two of the plaintiff's witnesses were unsure of the color of the hard-hats. Defense witnesses testified that Dow employees wore blue hard-hats and that supervisors from several of the contractors on site wore blue hard-hats. Defense testimony also indicated that National Maintenance Co., another contractor on site, could have been responsible for removing the subject blinds. White testified, however, that he personally supervised and directed mixed crews of J.E. Merit and National Maintenance

---

[11] **Shows** at 931.

employees.

Taking the evidence as a whole, we conclude that a reasonable juror was free to conclude that either or both of the two men in the pipe rack were employees of J.E. Merit.

We are mindful that the defendant's evidence cast doubt on the identity of the employees in the pipe rack, but there manifestly is no "great weight" of evidence in this record to that effect. All issues were hotly contested and supported by substantial evidence on both sides. This was a jury call and its decision must be reinstated. We therefore reverse the judgment as a matter of law and the alternative grant of new trial, and render judgment in favor of the plaintiff reinstating the jury verdict. An appropriate judgment thereon is to be entered by the district court.

REVERSED and RENDERED.